## THE ALGIC.

### BLOOM v. UNITED STATES.

District Court, S. D. New York.
March 16, 1934.

Lucien V. Axtell, of New York City (Silas B. Axtell, of New York City, of counsel), for libelant.

Martin Conboy, U. S. Atty., and Tompkins, Boal & Tompkins, all of New York City (Arthur M. Boal, of New York City, of counsel), for respondent.

BYERS, District Judge.

The libelant sues to recover for personal injuries suffered by him when he was about to go on duty as an able-bodied seaman on the steamship Algic when lying at her berth in Montevideo, on November 10, 1929. Three causes of action are pleaded in the libel:

(1) Negligence on the part of the defendant in failing to provide a safe place in which the libelant could work; in permitting oil to accumulate on the deck which he was required to use; in failing to keep the said deck clear and free from a slippery condition.

(2) Failing to put the libelant in the hospital; "in having a physician of the respondent advise the Captain and other officers on board, and the libelant that he was in a fit and physical condition to remain on board the vessel, and denying the libelant proper treatment, where he could receive physical therapy treatment;" in failing to furnish or cause to be furnished prompt, proper and medical care and attention to the libelant.

(3) Maintenance and cure and hospital bills for a reasonable period of disability.

The testimony makes it quite clear that the libelant did suffer a physical injury; namely, he struck the top of his head, in the right frontal area, against the steering gear on the Algic on the day in question.

In order to understand how the accident happened, it is necessary to explain that the libelant's sleeping quarters were in the fantail at the stern of the ship on the main deck, which contained the emergency hand wheel and the steering gear; he occupied a cabin with five other members of the crew on the starboard side of the ship, and was called to turn to at about 1:30 in the afternoon. The emergency wheel and the steering gear occupied that portion of the ship between the sleeping quarters on the starboard and port sides to such an extent that there was a passageway on each side, 4 feet in width, between the sleeping quarters and the gear; the emergency hand wheel constituted the forward element and occupied a platform which extended the entire width of the assembly. This wheel was connected with the steering mechanism itself by two rods of substantial construction which cleared the deck at a height of 4 feet 3 inches, and it was possible for men desiring to pass from one side of the ship to the other to do so under these rods. The dimensions of this opening are not stated but a photograph in evidence suggests that this space was not less than 6 feet, measured in a fore-and-aft direction.

The steering machinery is the aft part of the assembly, and was protected on all sides by a railing supported by stanchions at a height of about 3 feet from the deck. Passage around, i. e. forward of, the entire assembly was available to any member of the crew wishing to go from one side of the ship to the other. The distance across the steering mechanism from bulkhead to bulkhead was about 14 feet.

At the time in question, the libelant emerged from his quarters on the starboard side of the ship and, having occasion to use the toilet immediately aft, proceeded to that place but, because it was not available, he decided to use the opposite firemen's toilet on the port side of the ship. He testified that, while he was in the act of proceeding from the port side toilet, and was still in the passageway, his foot was caused to slip by an accumulation of oil on the deck, and he fell forward, striking his head as stated.

On conflicting evidence, it is found that this is not what occurred; that is to say, he

chose to cross under the steering rods, when he found the starboard toilet unavailable, rather than to go around the entire assembly, which would have taken him a second or two longer. He is 5 feet 3 inches in height and did not stoop sufficiently to avoid striking the steering rods as he sought to pass under them, or he miscalculated, and raised his head too soon; he suffered the injury in this way. It is assumed that there was some oil and water on the deck under the steering rods, which may have contributed to the result, but it is not found that, in the deck space to which reference has been made, between the quarters and the steering mechanism, there was any accumulation of oil, grease, water, etc., because there is no necessity for passing upon that subject specifically.

As to the effect of the libelant's choice of route, see Holm v. Cities Service Transp. Co. (C. C. A.) 60 F.(2d) 721.

Without recapitulating the testimony which is thought to justify this finding, the following incidents may be referred to as pointing to the reason for not accepting the libelant's version of the accident:

The libelant cannot be regarded as a reliable witness on this or other matters; there is a difference between his testimony on the trial and a statement which he signed on November 13th, two days after the accident; he admitted that the signature appearing on the statement was his, but denied that he had signed his name to any such paper. The recital therein is consistent with the testimony of the then chief officer concerning what the libelant reported on the afternoon of the accident, which testimony is:

"A. * * * and then he went to the firemen's toilet; he told me he went underneath the steering engine—he bumped his head on some parts of the engine.

"Q. Was it necessary for him to go under the steering engine to cross?

"A. No, sir.

"Q. How else could he have gone, Captain?

"A. Walked around the forward end of the steering engine."

The material portion of the statement bearing the libelant's signature and dated November 13, 1928, is:

"I then proceed to go to the fireman toilet. When I got about two feet from the steering engine I slipped and hit my head on some part of the steering engine."

Some of the reasons for not accepting the libelant's testimony as to the precise nature of the happening will appear in a later discussion of the testimony.

Immediately upon being assisted to his feet, the libelant went to the sailors' cabin and Edwards, a mess boy, helped him into the room; that is to say, he helped to raise him from his hands and knees, in which position he was underneath "that tiller" (i. e., the connecting rod between the hand wheel and the steering engine); Edwards' statement made to the ship's officer on November 13, 1929, is quite consistent with his deposition as to the place from which Bloom was assisted; he said:

"I saw Bloom laying on the deck under the steering engine on starboard side. I did not know that he was injured, as he was getting up. He came into day men room on starboard side of chip (sic) and I washed the cut on his head."

The first mate was called at once and the man received attention and about 5:00 o'clock, the matter having been reported to the master, the libelant was sent ashore to a doctor in Montevideo, who applied an antiseptic and a bandage.

That doctor testified by deposition, and stated, among other things, that he would not have permitted the libelant to return to the ship if he had deemed hospital treatment requisite; but that he discovered no signs of cerebral deficiency.

The ship sailed late in the day for Buenos Aires, where docking was completed at about 11:00 a. m. on the following day. The libelant was sent to Dr. Herzfeld by the first officer, but did not receive treatment on that day, because it was a holiday; on the following day he was again sent to the same physician, who cut away hair in the vicinity of the wound, applied an antiseptic, bandaged his head, and told the libelant to do no work but to drink plenty of water; the latter reported back to the ship and told the first officer what the doctor had said. He spent most of the next ten days in his bunk, doing no hard work. He testified that Dr. Herzfeld examined his ear, but whether it was on the occasion of the first, second or third visit, is not clear. The dates of those visits were November 12th, 14th and 20th, which means that the ship stayed in port for that time; on one of these occasions, the Captain sent the witness to a Dr. Hensa, to make an X-ray, at the recommendation of Dr. Herzfeld, and the libelant says that Dr. Hensa told him that he ought to go to a hospital for further ob-

servation, and that he was to drink plenty of water and rest up.

Dr. Hensa has not been examined, although attempts have been made to take his deposition, and apparently up to the time of trial this was impossible. In any event, the witness did not enter any hospital.

The ship sailed from Buenos Aires on November 27, 1929, and on the voyage north the libelant was not put in the sick bay but was left in his own quarters; on this voyage he stood his regular watches.

On arrival in Philadelphia on December 29, 1929, the libelant was paid off and came at once to New York. He does not remember how long it was before he went to a hospital in this city, and the transcript of the hospital record does not indicate the necessity for hospitalization at that time.

The libelant rested in New York for the ensuing two months and a half, and he did not seek any treatment at the hospital or elsewhere, and on March 16, 1930, he shipped as an able-bodied seaman on a Tracy oil tanker, and he took other employment of the same nature down through the month of November, 1930, on other ships; during 1931, he was on the Zarembo from October 22nd to November 20th. This last voyage was preceded by a medical examination for Shipping Board service on October 5, 1931, which was the seventh similar examination taken and passed by the libelant between April 21, 1927, and October 5, 1931, and the records indicate that there was no difference in the physical condition of the libelant on any of these dates as compared with any other. The first examination above referred to indicated a certain impairment of vision in the right eye, which was not as good as the left.

These circumstances have been set forth because of the injuries claimed by the libelant, as the result of the happening in question, as stated by his counsel at the trial, namely:

(1) Defective vision right eye.

(2) Defective hearing right ear.

(3) Partial paralysis right side of face—improving.

(4) General neurasthenia.

The history of the libelant shows that during the latter months of 1928 he was employed on the steamship D. M. Philbin of the Duluth Steamship Company, and claimed to have been injured in that employment, in a letter which he wrote to the agents of the company under date of October 16, 1928, which is in evidence. He stated in that communication that he had been struck by a sledge-hammer while in the act of breaking coal, and said that the hammer rebounded, striking him on the forehead. He said he was stunned by this heavy blow and, upon recovering his senses, was given first aid treatment by the first assistant engineer and the chief engineer. His letter continues:

"Since leaving the D. M. Philbin, I have undergone a medical examination of my head.

"This blow on the forehead has resulted, up to the present time, in violent head pains, especially at the base of my skull. Also a severe permanent injury and disfiguration of the right side of my face. This has been diagnosed as a partial paralysis of the seventh nerve. My right eye is losing its strength of vision also.

"Due to these injuries with which I am at present afflicted, and which may be followed by mental and physical aggravations of various sorts, it becomes impossible for me to continue at any employment until I have had proper medical treatment and a sufficient convalescent period afterwards.

"An operation on my skull has been suggested as a means of effecting a cure. Also electrical treatment for my face. As the skull operation may result in a cure, and then again it may bring no positive results in that regard, I do not feel that such a radical course should be undertaken, without plenty of time to deliberate on it.

"The accident occurred to me Wednesday, Oct. 3, 1928, at two o'clock in the afternoon.

"As the paralysis seems to be a permanent injury, also the resulting disfiguration, to say nothing of my failing eyesight and what may happen to my body in the future, I feel that I am entitled to a substantial compensation. Therefore this letter. * * *

"As a result of this accident, which befell me while in your employ, and through no wilful action on my part, I am doomed to go through life with a paralyzed face and in probability with but one eye.

"This letter is an explanation of the accident and an account of the medical diagnosis. It is written in a friendly spirit.

"I am asking for compensation as the injuries are very serious. Let us hope that an ambicle (sic) settlement will be reached in this matter.

"If you wish to have me undergo another medical examination, kindly arrange for my railroad fare to Cleveland and return to Chicago.

"Also accommodations for board and

lodging while enroute and in Cleveland. An X-ray will disclose the exactness of my injuries. I hope that you will give the contents of this letter serious consideration. I shall be expecting a reply from you in the near future.

"Yours truly,       Harry Bloom."

On May 31, 1929, the respondent executed, acknowledged and delivered a general release to the Duluth Steamship Company for the consideration of $50.00 for damages arising out of "being struck on the head by coal or by a hammer on board said steamer D. M. Philbin on or about October 3, 1928."

The libelant was examined by Dr. Frank W. Milward, of Cleveland, Ohio, on November 5, 1928, at the request of the insurer of the Duluth Steamship Company whose claim adjuster sent the libelant to the doctor, who was a witness on this trial. The libelant told him that he had been swinging a sledge which struck him and made a cut on the forehead. The doctor made an extended examination and reported a partial facial paralysis on the right side; that the patient could not close the right eye as completely as the left.

The libelant made a number of interesting statements to the physician; among others, that he was then on his way to South America where he expected to prospect for diamonds, and he explained to the doctor how he could avoid dividing the results of his expected search, if successful, with various government officials from whom permits would be required.

The foregoing testimony is persuasive that, if the libelant was suffering at the time that he filed the libel from a condition of facial paralysis and impaired vision in the right eye, those conditions antedated his voyage on the Algic. The same remark applies to the neurasthenia, if any.

That the libelant is not without well-developed powers of imagination otherwise appears from the testimony of John T. Edwards, who was the second officer of the Algic, in whose watch the libelant served both on the southbound and northbound voyages; during the former the libelant told Edwards that he had made many thousands of dollars trading in buffalo skins.

That witness observed the libelant on the northbound voyage, when he stood his trick at the wheel as related, and said that there was no incoherent speech on the part of the latter after the accident, or any other difference between his condition on the outbound trip, and on the homeward passage.

That the libelant is suffering at the present time from impaired hearing in the right ear is probably true, although a hospital examination given on April 29, 1932, by the Veterans Administration indicates that, so far as the right ear is concerned, the witness can hear a whisper at a distance of seven feet and a conversation at fifteen feet.

It is not felt that such impairment of hearing as exists has been traced by the libelant to this particular fall.

The result of a consideration of the testimony is that the libelant has failed to sustain his burden of proof as to the negligence charged in the libel, as previously stated.

The utmost that the evidence would warrant is a finding that there was a certain disability under which he suffered following the accident, and his arrival in this country, which continued until he shipped as an able-bodied seaman for the various voyages during the year 1930 to which reference has been made; that is, a period of 2½ months or 76 days, for which he could be allowed maintenance at $3.00 a day, making $228.00 in all. The libelant has offered no proof of disbursements for medical care or hospitalization during that period.

The libelant may take a decree for that sum for maintenance and cure, with costs.

Settle decree on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership.